2026 IL App (2d) 260185-U
No. 2-26-0185
Order filed July 23, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

PRISCILLA P. MARSHALL, Defendant-Appellant.

Appeal from the Circuit Court of Lake County.
Honorable Michael G. Nerheim, Judge, Presiding.
No. 26-CF-489

JUSTICE HUTCHINSON delivered the judgment of the court.
Presiding Justice Kennedy and Justice McLaren concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The circuit court did not err in finding that defendant was charged with detainable offenses; that she is a danger to the victim and the community; and that no condition or set of conditions could mitigate the real and present threat that she presents.

¶ 2   Defendant, Priscilla P. Marshall, appeals from an order of the circuit court, which granted the State's petition to detain her pending trial under what is commonly known as the "SAFE-T Act" or "Pretrial Fairness Act" (hereinafter the Act). See 725 ILCS 5/art. 110 (West 2024). The appellate defender has declined to file a memorandum on defendant's behalf and stands on her motion for relief. See Ill. S. Ct. R. 604(h)(2) (eff. Apr. 15, 2024). After reviewing the record, we affirm.

¶ 3                                   I. BACKGROUND

¶ 4     Although the facts are only preliminary at this stage, they are not in dispute for the limited purposes of this pretrial appeal. On March 7, 2026, defendant was arrested on a sworn complaint of aggravated battery to a child under 13, causing bodily harm (720 ILCS 5/12-3.05(b)(2) (West 2024)), domestic battery (*id*. § 12-3.2(a)(1)), and child endangerment (*id.* § 12C-5(a)(1)). In addition, defendant's paramour and co-defendant, Cody Marion, was arrested as well and charged in case No. 26-CF-488. The State filed a petition to detain defendant under the Act prior to trial and, at a hearing on the petition, the parties proceeded by way of proffer. We summarize the relevant evidence that was introduced at hearing, which largely consisted of the State's verified petition, pictures of the victim taken at the hospital, and the parties' attorneys' statements.

¶ 5     Defendant resides in Fox Lake and is the mother of five minor children: M.H., 13 (male); R.H., 11 (male); R.M., 7 (male); A.M., 3 (female); and S.M., 1 (female). The charges in this case are centered on defendant's abuse of 11-year-old R.H. At the detention hearing, the State asserted that R.H. suffered long term "systematic abuse and torture" at defendant's hands.

¶ 6     On March 6, 2026, Fox Lake police officers responded to a call of child in distress at a local business. There, they found R.H.; the child was wearing only his underwear and was covered in bruises. R.H. was taken to an area hospital, where his injuries were photographed and documented. Preliminary observations showed "numerous bruises throughout his head, arms, and legs, dried blood in his nose and mouth, and red welts across his chest, arms, and legs. R.H. also had dried blueish soapy substance on his face and chest." Protective custody was taken of all five children, and they were interviewed at the Lake County Children's Advocacy Center (CAC). The verified petition summarizes the children's statements as follows.

¶ 7   R.H. stated that he attended school through the end of fourth grade, but that defendant pulled him out for homeschooling for his fifth-grade year. On the morning of March 6, R.H. was awoken by defendant "throwing things around the house." Defendant's paramour, Marion, was cleaning dishes. Then, according to the State's petition:

> "Mom got mad and began hitting, pushing, and punching R.H, while telling him that nobody loves him. R.H.'s two younger sisters [(A.M. and S.M.)] were sitting on the couch crying, asking Mom to stop. Mom punched R.H. in the face, causing him to get a bloody nose. Mom also grabbed a bottle of dish soap and poured the soap down R.H.'s mouth and into his ear. R.H. coughed up blood afterwards. R.H. then ran out of the house, wearing nothing but underwear. As he was leaving, Mom grabbed a knife and held it to her throat, threatening to hurt herself. R.H. ran to a local flower shop, where he asked an employee to call 911."

¶ 8   During a CAC interview, R.H. stated that defendant began physically abusing him around 2023. During one incident, defendant "smacked him across the face." A mark was apparent on R.H.'s face, but defendant told him to lie about the abuse and not to tell anyone at school or she would go to jail. R.H. described ongoing abuse by defendant in that she would punch him and strike him with objects including extension cords, black metal spatulas, and spoons. Defendant had R.H. take off his clothes so that "when [she] hit[ ] him *** it will hurt more." Defendant also made R.H. write the following over and over in a notebook as punishment: " '[Y]ou're not a loved child, everybody hates you[.]' " Defendant would make R.H. write in the notebook while "while kneeling between uneven floorboards in the house."

¶ 9   The abuse was not confined solely to R.H. Defendant also forced older brother M.H. to "beat up R.H. by choking him, punching him in the chest, stomach, and face, and slamming him

to the ground." R.H. described another incident where defendant threw "scissors used to cut hair" at him, which scratched him on the side of his head. Approximately two months before R.H. ran from the home, defendant punched R.H. in the face with enough force to cause his tooth to chip (as documented in State's Exhibit #4). According to R.H., defendant rips his clothes and forces him to "put his hands on the kitchen counter so she can strike him." She has also spit in his face.

¶ 10 R.H.'s siblings "do not get hit, just him." According to R.H., he receives meager food in comparison to his siblings, and is forced to eat separate from the family, usually while sitting alone in the hallway. R.H. has a bed in his room but "has to sleep on the floor." R.H. is not allowed outside "except to take out the trash and get the mail." Defendant tells R.H. that his brothers are her "two favorite boys" and that R.H. is "just the adopted child." Defendant told R.H. that she was "going to stab him in the back 33 times." Defendant has told R.H. that he "deserves to die" and that one day she will "dump his body."

¶ 11 According to the State, Marion, defendant's paramour and co-defendant, witnessed the abuse and told R.H. that "if he didn't listen, he was going to get beaten by [defendant]." Marion told R.H. that he "deserved it and should just take it."

¶ 12 R.H.'s sibling, R.M., was also interviewed. R.M. indicated that defendant hurt R.H. "when he doesn't listen[,]" that the abuse occurred "everyday" and that defendant often used a " 'cooking thing' " to strike R.H. Further, the State noted, one of defendant's neighbors reported that he routinely heard screaming coming from defendant's home.

¶ 13 With respect to defendant's criminal history, that State asserted that defendant has a 2010 conviction for driving under the influence and a "17 CF manufactured delivery [*sic*] case that resulted in probation on a Class 4 possession of a controlled substance." (Specifically, the State was referring to Lake County case No. 17-CF-154, in which defendant pled guilty and completed

- 4 -

a two-year term of probation.) In addition, the prosecutor stated that defendant has had "12 prior failure to appear warrants issued for numerous traffic offenses." The State did not proffer this as evidence of willful flight but rather asserted that it was evidence that defendant was unlikely to comply with pretrial release conditions.

¶ 14　In response, defense counsel stated that defendant is a 34-year-old "stay at home mother" and occasional Door Dash driver who "suffers from a combination of depression and anxiety as well as likely post-traumatic stress disorder." In addition, counsel stated that R.H. struggles with "attention deficit hyperactivity disorder[.]" According to counsel, this case is "part [of] an underlying mental health concern in the home that is not being fully or adequately addressed." Counsel noted that defendant's most recent failure to appear was for a speeding ticket in 2018. With respect to defendant's prior criminal history, counsel noted that defendant satisfactorily completed 24 months of probation "which included drug and alcohol treatment, public service hours, et cetera which would indicate she was able to follow court orders."

¶ 15　Counsel conceded that defendant "may be" a danger to R.H. but asserted that she was not "a danger to the community at large." Counsel proffered that, "per DCFS[,]" R.H. was in the custody of his biological father in LaSalle County and that conditions could be entered to protect R.H. from defendant as he was no longer in her home.

¶ 16　The circuit court found that defendant was charged with detainable offenses as the complaints alleged domestic battery, which is also a forcible felony when it is based on the infliction of great bodily harm. 725 ILCS 5/110-6.1(a)(1.5), (a)(4) (West 2024). The court found the proof evident or the presumption great, stating:

> "The statements of the minor child in this case are corroborated by the statements of the defendant, her co-defendant[ ], his siblings, a neighbor who indicated that he

routinely heard screaming coming from the house, as well as observations of medical professionals and observations of law enforcement which all corroborate what the victim in this case indicated happened."

The circuit court stated that it found defendant's conduct "chilling" and noted that this was not an "isolated incident" but rather "systematic abuse which has occurred over the course of years."

¶ 17　The circuit court then addressed defendant's dangerousness and the suitability of pretrial release conditions, stating as follows:

"[W]hether the State has met their burden to establish that the defendant poses a real and present threat to any person in the community, and, if so, are there conditions of release that I could impose short of detention that would mitigate that concern. I am cognizant of the fact that the SAFE-T Act requires that I presume everybody to be eligible for pre-trial release, and I can't detain somebody simply based on the nature of the offense no matter how serious the offense is.

In considering the specific nature and circumstances of this offense I consider the weight of the evidence that the State has. I consider the significance of the charges. I consider that this is a crime of violence. That it did involve the use of weapons. I consider the age of the victim and the age of the defendant. I consider the fact that this *** as set forth in the State's petition amounts to long term systematic abuse which *** has occurred over the course of multiple years.

I consider the fact that the defendant has taken efforts to conceal this abuse in a couple of ways. One by removing the child from school. Also[,] by telling the child to lie. I consider the fact that there is alleged to be prior DCFS involvement as well as the fact that there is a history. When I consider the history and tactics of the defendant, although

- 6 -

not a history of violen[t] offenses there is a history of the defendant not coming to [c]ourt and not following *** [c]ourt orders in several of her cases. There were multiple failure to appear warrants issued as well as [p]etitions to [r]evoke that had to be filed.

So[,] I do believe that the State has established that the defendant does pose a real and present threat to this child as well as to other children that she may have contact with based on what is set forth in this petition, and I don't believe there are any conditions that I could impose that would likely be followed that would mitigate the threat that *** as I indicated I believe the State has established.

I did specifically consider electronic home monitoring as an alternative to incarceration. The concern with that being, number one, it does not exist anymore in Lake County, Illinois, but number two, even if it did, this is all alleged to have occurred in the defendant's home where there are other children presently. And I understand that this particular child has been removed from her custody, but as I indicated based on everything that I considered and is set forth in the petition the State has clearly met their burden and I am going to grant the petition."

¶ 18 Several days after the hearing, the defense filed a seven-page motion for relief, to which the State filed an eleven-page response. The State's response noted that defendant's case was pending before the grand jury, which ultimately indicted defendant for five counts of aggravated battery to a child (720 ILCS 5/12-3.05(b)(2) (West 2024)), five counts of domestic battery (*id*. § 12-3.2(a)(1)), and one count of endangering the life or health of a child (*id*. § 12C-5(a)(1)).

¶ 19 In the motion for relief, defendant asked the court to reconsider its finding of dangerousness. More specifically, the motion noted that all five children had been removed from defendant's home during her detention and were now placed with relatives in LaSalle and Will

County. Thus, the motion argued that, to the extent defendant was a danger to her children, her children were no longer living with her so she was not a "real and *present*" threat to them or the community. The motion also asserted that the court had misconstrued the import of defendant's prior traffic warrants and argued that the State did not demonstrate a high likelihood of willful flight (even though defendant had not been detained on that ground). Finally, the motion asserted that the threat defendant posed could be mitigated "regular visits with pre-trial services" as well as "any other conditions *** the [c]ourt deem[ed] appropriate."

¶ 20      At the hearing on the motion for relief, defense counsel noted that several family members were present in court and on Zoom in support of defendant. Counsel proffered that defendant's family members all believed she would follow any court orders to stay away from the children, and that defendant's family would bring her to court because she did not have a car. Counsel further proffered that the DCFS investigator in the case had stated that she did not have a safety concern for the children as long as defendant was living in a different municipality. Counsel then referred to a police report regarding domestic violence between Marion and defendant and noted that Marion had been the aggressor in one instance and that, on two separate occasions, defendant and the children stayed at a hotel because of safety concerns. According to counsel, defendant reported that she began taking parenting classes in the county jail.

¶ 21      The State countered that none of what the defense put forward was new or material information. Moreover, the State noted that a police report from 2017 described an incident where defendant enlisted R.H.'s father to pick R.H. up from defendant's mother's home and "secretly give" R.H. to her so that she could remove R.H. from his grandmother's care and "take [him] to McHenry with [defendant]." In other words, "[defendant] tried to use the biological father who currently has the child to secretly get the child back." When defendant's mother learned of the

scheme, she called the police. According to the State, R.H.'s father "said he wanted nothing to do with it" but it is unclear from the context whether R.H.'s father was referring to defendant's scheme or, more generally, R.H.'s care. In any event, the State argued that this incident was evidence that defendant would not abide by release conditions, and could possibly reenlist R.H.'s father in a scheme to evade a no-contact order with R.H. The State noted again the level of violence defendant inflicted on R.H., as well as "previous DCFS investigations in which the defendant exerted her control in order to get the minor victim to lie to recant his statements about her abuse." The prosecutor finally drew the court's attention to the fact that defendant's family members had appeared to support her and not the victim. Defense counsel replied that the 2017 incident was merely an allegation and pointed out that defendant had not actually taken R.H. in 2017.

¶ 22    The circuit court reiterated that this case was "particularly egregious" and stated that it had detained defendant based on her dangerousness, and not willful-flight grounds, showing that it had not misconstrued the State's evidence. Citing *People v. Romine*, 2024 IL App (4th) 240321, the court also noted that while defendant had minimal criminal history, her conduct in abusing R.H. demonstrated a complete disregard for societal norms as well as the safety of the victim, other children, and the community. Further, the court stated, it had no control over how DCFS administered the children's protective custody and, again, that electronic home monitoring was not "24/7" and could not guard against further abuse occurring in the home. The court restated its findings that no condition short of detention would avert the real and present threat defendant posed to R.H., her children, and the community. Defendant timely appealed.

¶ 23                                    II. ANALYSIS

¶ 24    As noted, before this court defendant has elected to stand on her motion for relief. For its part, the State responds that it presented clear and convincing evidence on each of the three issues warranting defendant's pretrial detention. We agree with the State.

¶ 25    Pursuant to the Act, all defendants are presumed eligible for pretrial release with conditions. See 725 ILCS 5/110-6.1(e) (West 2024). However, in certain cases, the State may seek pretrial detention based on the defendant's dangerousness or risk of his risk of willful flight. Here, the State's petition to detain proceeded under the allegation of defendant's dangerousness, and the parties proceeded by way of proffer. To deny a defendant pretrial release on grounds of dangerousness, the circuit court must find that the State proved the following by clear and convincing evidence: (1) the proof is evident or the presumption great that defendant committed a detainable offense (*id.* § 110-6.1(e)(1)); (2) defendant's pretrial release poses a real and present threat to the safety of any person or persons or the community (*id.* § 110-6.1(e)(2)); and (3) no condition or combination of conditions can mitigate the real and present threat to the safety of any person or the community (*id.* § 110-6.1(e)(3)). Where parties to a pretrial detention hearing proceed solely by proffer, our review is *de novo*. *People v. Morgan*, 2020 IL 130626, ¶ 51. Although our review is independent, and does not defer to the circuit court's findings, we nevertheless reach the same conclusions with respect to all three findings.

¶ 26    First, there is no dispute that defendant is charged with detainable offenses including forcible felonies against a child and crimes of domestic violence. 725 ILCS 5/110-6.1(a)(1.5), (a)(4). Although the only documentary evidence included in the record was six photographs of R.H. taken at the hospital, they depict extensive injuries to R.H.'s face, torso, and limbs. In addition to the fact that the State proffered strong evidence that defendant committed the charged offenses,

there has been no dispute that defendant was indeed the person that long inflicted violent physical harm on R.H. The first prong was unquestionably satisfied.

¶ 27    Second, we agree with the circuit court that the evidence shows defendant is a danger to R.H., other children, and the community. With respect to dangerousness, the court may consider a variety of factors in making its determination, which may include, but are not limited to, the nature and circumstances of the charged offense including whether the crime was a crime of violence; the history and characteristics of the defendant; the use of or access to weapons; any statements made by the defendant and the circumstances surrounding them; and the age and physical condition of the defendant and the victim. 725 ILCS 5/110-6.1(g) (West 2024). Although a court's decision cannot be based exclusively on any single factor, the nature and seriousness of the danger—*i.e.*, the real and present threat defendant presents—must be assessed with reference to "the specific articulable facts of the case." *Id*. § 110-6.1(e)(2), (g).

¶ 28    Again, we look beyond the labels in the charging instrument and examine the defendant's underlying conduct. Not all batteries are the same, and not everyone charged with such offenses is necessarily a danger to others. This case, however, is different. The conduct alleged highlights practically every dangerousness factor under the Act. Defendant repeatedly used household objects as weapons to inflict bodily harm on the victim. She also used her greater physical size and command over her other children as a means to further inflict violence on R.H. and psychological harm to his siblings. She repeatedly stated that she would stab and kill her son and "dump his body." Such behavior is far beyond the boundaries of reasonable parental discipline. See *People v. Green*, 2011 IL App (2d) 091123, ¶ 24.

¶ 29    But to say, as the defense did below, that defendant is "only" a danger to her own children, we believe, misconceives the nature of that danger entirely. None of the evidence indicates that

defendant holds the safety of others' children as more important than her own, and if defendant is willing to inflict this level of violence on her own child, and even threaten to do worse, then it is unreasonable to think that a child who is a stranger to her would be safe. Again, we must agree with the circuit court: the evidence shows that defendant is a real and present threat to the safety of R.H., to the safety of children, and to the safety of the community as well.

¶ 30    Finally, we also agree with the circuit court that ordinary less-restrictive pretrial release conditions would be wholly inadequate to mitigate the danger defendant poses. None of the customary conditions set forth in the Act (725 ILCS 5/110-5 (West 2024)) would reasonably ensure the safety of R.H. and of the community. Even with electronic monitoring, pretrial home confinement is statutorily limited to only five days per week (see 730 ILCS 5/5-8A-4(A-1) (West 2024)) added to which all of the charged offenses were alleged to have occurred in defendant's home. Like the circuit court, we do not find defendant's criminal history and traffic-court warrants to be of overwhelming concern, but it does not speak well for her ability to abide by court orders or to present herself in court when directed to do so, and that alone might be enough to justify her detention alongside a finding of dangerousness. See, *e.g.*, *People v. Mikolaitis*, 2024 IL 130693, ¶ 24 (affirming detention where circuit court determined defendant's failure to comply with doctor's directives to take prescribed medication indicated he would not comply with conditions of release).

¶ 31    What is far more grave and troubling is defendant's pattern of harming R.H., of threatening his safety, and concealing his abuse. In addition, while there are many details related to the 2017 custody incident that are not clear from the record (the police report the parties referred to was not submitted into evidence), it nonetheless demonstrates defendant's willingness to resist court orders in service of gaining access to or communicating with R.H. even when he is not in her custody. Our concerns include not only witness tampering (of which defendant has a documented history

with this victim) but also extend to threats to R.H.'s life and safety (of which defendant has a documented history with this victim).

¶ 32 Even if we were to favorably weigh defendant's criminal history, like the circuit court, we are persuaded by our colleagues' statements in *People v. Romine*, 2024 IL App (4th) 240321. In some cases:

> "Ultimately, the evidence of a defendant's charged conduct, even if it took place on a single occasion, may reflect such a departure from the basic expectations of civil society that it becomes difficult to predict the defendant's compliance with court orders—or even societal norms regarding the safety of others—if the defendant is placed on pretrial release. The presumption in favor of pretrial release under the Act does not obligate a trial court to release such a defendant in the hopes that his otherwise spotless record will negate the real and present threat he poses to the safety of the community as shown by the State's evidence." *Id.* ¶ 20.

We agree with the circuit court that this is such a case. What is more, defendant's alleged conduct did not take place only once; rather, it was a campaign of violence and torture that clearly spanned *years*. When we consider the specific articulable facts of this case, we are left with the firm conclusion that no condition or set of conditions would mitigate the real and present threat that defendant presents. The circuit court committed no error. Defendant's detention is entirely warranted.

¶ 33                                    III. CONCLUSION

¶ 34 For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 35 Affirmed.